The last case on calendar for argument is Interpipe Contracting and Associated Builders and Contractors of California Cooperation Committee v. Xavier Becerra, Cases 17-55248 and 17-55263. Before we start the clock, I think you all asked for unlimited time and we said no, but we did expand the time and so let me just make sure we've got this because I've got four lawyers here and I think that for some reason I believe that right now if we're on the appellant's side, I believe you said you were going to take ten minutes each? Yes, that's correct. And you are with? David Waltz for Interpipe. Okay, and then are you Anastasia Bowden? And so then you're going to take ten minutes, right? Okay, so I guess both of you within your ten minutes have rebuttal time? Yes. So it's still only ten minutes and I'm going to tell the one that's seated at the table because the first one that runs up to the podium sometimes just keeps talking and talking and then I see the person seated at the table thinking, are they taking up my ten minutes? I've been in that situation before. And so what I will tell you is you get your ten minutes, all right? If we happen to have more questions of you, I'm not giving you more time, but anytime the court has questions, we're here to answer all of our questions. So if we take you over, then don't worry. If you keep talking and I'm going to say, hey, sit down, okay? Now, just in terms of the people that are seated for the appellant, I see two people. I think Seth Goldstein and Ken Lau, is that right? And you're each going to take ten minutes? Okay, and you don't have rebuttal, right? Okay, so it's just ten minutes and the same thing goes. Who's going first? Of you two. Of you two. All right, so if you're going over, don't worry. You'll get your ten. Either I'll pull him off or he's answering our questions, okay? All right, so I think we're ready to start the clock. So please state your name and your appearance for which party. Thank you. Good morning, Your Honor. May it please the Court. David Woldz of Woldz Law Group, San Diego, California. Plaintiff Appellant Interpipe Contracting, Incorporated. I'd like to reserve three minutes for rebuttal out of my ten. And I'd like to start with a couple of comments regarding our client, Interpipe, which is a woman-owned plumbing and piping contractor based in San Diego that is open shop, has been a non-union contractor that's worked on state prevailing wage jobs, principally schools, since 1985. It has contributed to the Associated Builders and Contractors, the CCC, which I will just call ABC for shorthand, which is an industry advancement group of 501C6 Corporation that was created to represent the interests of open shop contractors throughout California. As a result of the prior law before SB 954, Interpipe was able to take credit for its agreements, primarily before public agencies that contract public works, including schools and other projects throughout the state of California. So you're not making a First Amendment claim, and they are, though, right? That is correct. Ms. Bolton is. And you've also, there's also affidavits filed saying that if you win, you're still, well, you still would give them the money to give them standing, to give, is that right? I do not recall that. Redressability. Redressability. Didn't you, that you would still continue to make the contributions to them? Oh, yes. Because otherwise they wouldn't have standing. Yes, absolutely. Okay. We would. You're making me think I was making that up. Excuse me. That's. We look for a return to the pre-SB 954 rules, which provided an equitable allocation of free speech rights to Interpipe and other contractors, as well as labor organizations that support project labor agreements. ABC was created to oppose these because they take jobs away. I think I've got your differences. So SB 94 leaves Interpipe free to express its labor views whenever, whatever terms it chooses. My question is, can you cite any authority where a court held that a state labor standard impermissibly infringed protected labor speech under the NLRA because it denied an employer a funding mechanism for its speech? Do you have any case? Well, the closest case is, of course, Chamber of Commerce v. Brown. Which I am familiar with. And which imposed use restrictions on state funds that were provided to employers throughout California. But it's not exactly the same as your case. No, it's not. But it does have a very similar effect because the Supreme Court determined in the Brown case that there was an indirect impact on employer speech that related to the restrictions that were imposed by AB 1889 and that they tipped the balance of collective bargaining agreement and labor relations in violation of the machinist preemption requirements and were preempted by federal law. But there is not a- Well, the Browns sort of said, expressed concern that AB 1899's severe enforcement mechanism effectively put employers to a coercive choice, either to accept state funding or forego speaking on labor issues or decline state funding and freely engage in labor speech, right? Yes. So, is there an analogous state coercion case, is there an analogous state coercion under SB 954? Can you analogize that? Not that it affects funding like this. In fact, our position is that this particular restriction on employer credits is unique in prevailing wage law throughout the country. This is the only law that restricts the ability of an employer to obtain prevailing wage credits because of its union affiliation. So, if- do employers have a protected right under the NLRA to use their employees' wages to fund third-party organizations? And if not, how does the NLRA preempt a law that only allows employers to do so through a collective bargaining agreement? Well, I think that the initial response I'd like to make to that question is that the Department of Industrial Relations, Christine Baker, a party here, determined that the payments- directed to our office- that the employers' payments made and taken credit for by Interpipe to ABC did not constitute wages, did not reduce the wage package available to employees because under the California prevailing wage design, you have employee benefit and wage matters and employer payments. And this is deemed always, not only in California, but also under the Federal Davis-Bacon Act and other states that have similar little Davis-Bacon statutes, these payments are deemed not to be wages. Well, let me ask you this. Okay, before 2004, as I understand it, California's prevailing wage law did not allow employers to wage credit contributions to industry advancements, the IAFs as you call them at all, right? Before 2004. Is that right? No. I do not believe that's right. Because those- prior to that time, there were allowances for payments, for example, to programs that were labor management cooperation committees created under the Labor Management Cooperation Act of 1978 that have been the recipient of prevailing wage contributions by contractors for decades. So what you do, you could do it prior to 2004? Yes. Okay. Now, in 2004, this organization was created in 2004. It had no predecessor. So we don't know what you could do before 2004. Well, but the law did allow for contributions to labor management cooperation committees prior to that time. So if- but if we agree with you that SB 954 is discriminatory, don't equal protection principles require us to eliminate the IAF wage credit altogether rather than impose a wage credit regime for all employers that California was not required to provide in the first place? If that was done and if those credits were denied for everybody, we would not have a problem with that statute. If that- if the deduction was taken away, in other words, for union program contributions and non-union program contributions, we were at peace with that. That does not set up a distinction in the law based upon an employer's union organizational philosophy. Okay. Well, I've taken you over, so- but I'm going to give you three minutes for rebuttal. That happened so quickly. Thank you very much. I know. You answered the question, so that's- it's- time flies when you're having fun, right? Thank you. Okay. So he has three minutes left, and then we'll start your clock. You've got- you've got ten. May it please the court, Anastasia Bowden for Appellant ABC. I'd like to try to reserve two minutes for rebuttal. The point of SB 954 is to eliminate prevailing wage contributions to organizations with an open shop viewpoint, which the government does not approve of. The law does that by limiting prevailing wage contributions to organizations selected by a union in a collective bargaining agreement. ABC adequately alleged that SB 954 acts as a proxy for viewpoint discrimination, and it was likely- What's your best case? Do you have any case standing for the proposition that organizations like ABC have a right to infringing on the right to spend money in some way? They certainly have a right to receive- to be on the same terms as other organizations in their ability to collect funds. So this would be equivalent to the cases like in the line of Riley, where the solicitors want to be able- are limited and they're able to be paid in order to speak. There's also cases having to do with campaign finance, where the politicians themselves bring- But see, they're not claiming the First Amendment. So in- are you trying to claim third party standing for their First Amendment rights? No, we think our First Amendment rights are being violated in ourselves because we're being limited in our ability to raise funds for our speech based on our viewpoint, and that's a claim under the Riley line of cases, campaign finance cases, and also even the subsidy cases, where- Well, you know, there are cases that you cite involving solicitation, but this particular law doesn't restrict your ability to solicit funds in any way. It may impact your- the ability to- it may reduce the contribution, that's the byproduct of it, but it doesn't directly impinge on your expressive activity, does it? That's right, Judge Winn, but we believe that the ability to collect funds to fund your speech is protected by the First Amendment, but even if this court doesn't think that free speech is at issue, we still brought an equal protection claim and we argue that the law treats our organization differently based on its viewpoint, and so we would still have stated a claim under the 14th Amendment and we should be entitled to discovery to prove that claim if the court does not determine that we were likely to prevail at the merits at this time. So I guess I'm hearing you say, though, I think that you didn't come up with a free- a case that- the case where the Supreme Court has held that there is- exists a freestanding right under the First Amendment to amass funds to support one's speech. No, we do cite cases like that, that- I believe that quote is directly from a campaign finance case. Well, what's your best case, then? We have relied more heavily on the Riley line of cases and also the subsidy lines of cases, which I think say exactly the same thing. Can I have a name of a case? Sure, sure. The campaign finance cases are the McCutcheon case, the McConnell case, and there are a few others that are cited in our brief. Riley, City of Schaumburg, those are the solicitation cases and the subsidy lines of cases are the Regan cases. And Regan itself, which defendants- or, pardon me, opposing counsel relies on most heavily says- Now, Randall considered a candidate's ability to amass funds as part of a test to determine whether a campaign finance law limiting one's contributions was lawful, but it seems to me that it might be distinct from your claim that you have a standalone First Amendment right to collect funds from others. We believe that we have a right to be on equal terms with other organizations in our ability to collect funding for our speech, but again, if this court disagrees that the First Amendment is not directly implicated, we still brought an equal protection claim and that would ameliorate any of those concerns. So, we have argued here that the CBA acts as a proxy for viewpoint and the Supreme Court has affirmed that even neutral criteria can act as a proxy for viewpoint. So in the cases relied on most heavily by the government, the state upheld those distinctions only because it found explicitly in those cases that there was no discrimination either in its effect or in the intent. And so here we've argued that there was both and based on those claims, we should have been able to move to discovery in order to prove those claims. There's plenty of discovery that we could have collected that would have proved that this is based on our viewpoint, that CBAs do not ensure consent. They only ensure that organizations like ours, which advocate in ways that labor unions do not like, will not receive contributions or will not receive prevailing wage contributions at all. So, does every open shop organization contribute to you? No, but under the prior version of the law, they were able to, we were, we had the ability to raise funds that way. I mean, they're still able to, they just can't claim a prevailing wage credit for it. That's right. They were able to and able to receive a prevailing, a corresponding prevailing wage credit and now they cannot. Even under the current law, they're still able to. They're able to do it. They just can't claim a prevailing wage credit. That's right. And that's unequal treatment because organizations of the same type as ours that have a different viewpoint are eligible for prevailing wage contributions. They will receive them while we will not. What can't you say now that you could before January 1st, 2017? Before the law went into effect, we didn't know, well, there was no evidence about how it would affect us now. And there is something in the record because we moved for expedited hearing based on, based on a declaration by the executive director of ABC that our funding has declined by 99%. Not talking about the funding. What can't you say now that you could before January 1st of 2017? How are your first amendment rights impacted? Oh, I see what you mean. What can't you say now that you could before SB 954? We're certainly still able to speak. Exactly. But we are discriminated against in our ability to fund our speech, which is protected by the first amendment. The ability to fund one's speech is protected by the first amendment. Which I want to get to Judge Wynn's question. Tell me a case that there's a first amendment right or any other right to receive another person's funds. You have, under the cases that I've already cited, the campaign finance, the solicitation cases and the subsidy cases, you have a right to be on equal footing. You got a right to ask, don't you? You got a right to ask somebody for money. That's what Riley said, didn't it? No, Riley said that the burdens on the ability to fund solicitation themselves affect free speech rights. So in Riley, the solicitors, there was a limitation on the amount that they could be paid. I'm just trying to think hypothetically. If we were to agree with you, there's some concern right now in the philanthropic communities that by doubling the standard deduction, the recent tax overhaul will disincentivize individuals from making tax deductible donations to charities. This could reduce charities' funding and impair their ability to engage in first amendment protected activities such as soliciting contributions. Under your theory of the case, do charities have an actionable claim that the tax law implicates their first amendment rights to collect funds necessary to finance their speech? If they allege that they were being disproportionately burdened because of their viewpoint, I think they would have a first amendment claim. Even if you don't have a right to collect funds in the first place, there's certainly a right to be on equal footing. And that's the same with the subsidy cases. You don't necessarily have a right to a government subsidy in the first place, but when the government withholds subsidies based on viewpoint, you have a first amendment claim that transforms it into a first amendment claim. But there isn't a direct impact on your ability to solicit to ask for the funds, right? It's subject to the collective bargaining process. That's what the state law is designed to do, right? That's not what we argue the burden is. It may be that you're not as viable of a player because of your... That's exactly right. We're a less valuable player and that's because of our viewpoint. Ms. Bowden, you said a right to the government's funds. These aren't the government's funds. These are workers' paychecks. You don't have a right to their paycheck, do you? I agree with that. But I think that if some organizations are given the availability of having these funds contributed to them and then getting a corresponding credit, we too have the same right to that. We cannot be denied that same advantage simply because of our viewpoint. You can ask them for money now, can't you? What's preventing you from asking them for money? The harm to us, the injury, is that we are being disadvantaged in our ability to obtain these funds. As we allegedly... Let me... I think your best argument is that SB 954 effectively favors pro-union speech over pro-open shop speech and the NLRA expressly protects free debate over labor issues. Is that what you're saying? Well, I think the NLRA portion is more relevant to the preemption claim. But yes, we do argue that we're being disadvantaged based on our viewpoint. As we alleged, we don't get money as a result of CBAs and we're going to lose all of our funding. Indeed, we've lost almost all of our funding because we don't receive prevailing contributions. Okay. I think I've already given you 10 minutes, but I'll still give you 10 minutes for rebuttal. Thank you. Thank you. Okay. So, just so that we're clear, the first appellant gets three minutes and the second gets two on rebuttal. Good morning. Good morning. May it please the Court. My name is Ken Lau and I'm here today to represent the California Director of Industrial Relations, Christine Baker, and the California Labor Commissioner, Julie Hsu. I'm going to present argument on the preemption issues to respond to Interpipe. And my colleague, Seth Goldstein, from the California Attorney General's Office, will present argument on the First Amendment issues to respond to ABC. Well, do you – well, what about – so I think the last question that I asked is that I guess we call it ABC or that – she said that what really went more to the NOA issue is it seems like it's easier to have pro-union speech as opposed to pro-open shop speech here based on this statute. So tell me about that. Sure. Well, I – it goes – I mean, California likes to tell everyone what to do on everything. And so, I mean, we look seriously at these things in terms of preemption. Right. Well, what – we heard a lot about – from Interpipe about how SB 954 affects employers. But what we didn't hear much about is how SB 954 affects workers. And that's, I think, the answer to your question, Judge Callahan. This is a minimum labor standard regulation, right? SB 954 is part of California's prevailing wage law, which is a minimum wage law. And its purpose is to – its overall purpose is to protect and benefit employees on public works projects. And so, as a part of the minimum wage law, the prevailing wage law, SB 954 protects workers equally, union or non-union, because it sets a floor as to what employers can do to divert wages to industry advancement funds. Well, I think Interpipes thought that their closest and best case was Chamber of Commerce. And SB 954 is a little like AB 1889 in that neither law actually regulated what the entity could say, yet the Supreme Court rejected AB 1889 as violating the NLRA's position protecting labor speech. How do you distinguish Brown? Well, Brown basically predicated the receipt or the use of state funds on an employer, not talking about speech that Congress intended to leave unregulated under 8C. Here, SB 954 doesn't restrict any type of speech on its face. It doesn't restrict any type of speech at all. And in fact, you could have a – It makes it harder for 8C to speak because they don't have any money now. Well, they could ask for that money from workers, or they could ask for that money from employers, right? What you go back to is that this is the workers' money, it's workers' wages that they are trying to take away. So why don't we just get rid of this, take it all away to both the unions and the non-unions, and then everyone thought that the workers might be happy? Right, but the workers have collectively bargained to send these wages to an industry advancement fund of their choosing, so it's respecting worker choice, right? But there are industry advancement funds that are from unions that aren't made as part of the collective bargaining process, right? That's correct. So it's unlikely, it's undeniable that it's more unlikely that shops like 8C's will not be named, but that doesn't mean that there are IAFs who are pro-union that are necessarily going to be named as part of the collective bargaining process either. That's correct. That's correct because SB 954, it says that it would only allow prevailing wage credit when there's a collective bargaining agreement that obligates the employer to send those payments to an industry advancement fund. So you could have a pro-union or a union employer who negotiates with the union and fails to come to an agreement, right? They may not be able to send any payments to union-affiliated... You are so sincerely in favor of the workers here that this is what you're to hear. So if I can respond to the argument that why do we need 954? Well, I think 954... Because what they're saying, 950, I think what ABC is saying is 954 is targeted at them to hurt people like that. But you're saying that, what are you saying the purpose for 954 was? Well, I believe that 954 recognizes... Because you want to help all workers, I guess, not just union workers, right? You just want to help all workers. That's what you're telling me. That's correct. That's what California wants to do. Yes, it's a minimum labor standard, just like those that have been upheld by this court in Viceroy Gold, in National Broadcasting, and most recently in American Hotel and Lodging Association. And I think SB 954 recognizes that workers sometimes collectively bargain, and a one... Does it have a... You know, like sometimes at the beginning of legislation it said, this is why we're doing it. We're doing this to correct such and such. How do we know what the... You know, even though poor Judge Scalia would probably flip in his grave if we were talking about the legislative intent. But you say the legislative intent here is to help all workers, right? Is that... How do I know that? Well... How do I know that it isn't just to target, you know, people that want to speak about non-unions? Well, the structure of the law itself, right? Because it prevents all employers from sending industry advancement funds and take a credit for it, workers have collectively bargained and chosen to send those payments to an industry advancement fund. So the structure of the law itself, and I think there is some legislative history. There's no preamble that talks about what the intent is. But there is legislative history, and I think the district court cited that in its order, that it's about worker consent or worker choice. And so I want to go back to the Chamber v. Brown case. Aside from SB 954 not directly regulating speech like the statute at issue in Chamber v. Brown, here the statute, the speech that's at issue that appellants are arguing or alleging that they're engaging in, that's not even covered under machinist preemption, right? In Brown, they went through the NLRA and Section 7 and Section 8C, and 8C speech was speech by employers directed towards its own employees for or against unionization, right? Whether it be an employer saying, oh, these are the pros and cons of joining a union, or maybe you want to consider another union. But here, what Interpipe and ABC are alleging, they're engaging in speech to the public and to public agencies. So Brown shouldn't be read to extend that far to leave that type of speech unregulated. So who should I put the question to about whether this is conduct or speech? Should that be you or should it be the person seated at the table? It should probably be to Mr. Goldstein. He will address that, I think, that question. And over-inclusive and under-inclusive should go to him, too? Probably. That sounds more like it's directed towards the First Amendment issues. See, I'm running out of time, but I'd like to add that there's a lot of leaps that one must take in order to extend Brown to SB 954. We go back—I want to circle back to SB 954 being a minimum wage statute. And if you look at—take, for example, American Hotel, which was a minimum wage ordinance in L.A. that applied to certain hotels, and it was roughly a $15 minimum wage. What Interpipe seems to be arguing is that they can pay $14 to the worker, take a dollar, and send that dollar to an industry advancement fund. That's essentially what they're arguing here, that the NLRA allows for that. And that's taking a huge leap and expanding the holding of Brown. And given that the Supreme Court has counseled, has cautioned courts to be reluctant to infer preemption, I think the court should affirm the judgment dismissing the action. But in the prior version of the statute, Code Section 1773.1, they were able to do that, right? Arguably, under 1773.1, I think it's A-9, there's a catch-all that— So you could pay $14, take a dollar, and then get that contribution to an IAF that may not be the worker's choice, so not related to the same industry, and then claim a prevailing wage credit for that. Sure, so that's exactly why— I'm correct in understanding that this new law, SB 954, was designed to correct that, in that the only difference is that the IAF now has to be a part of the collective bargaining process. Right, so that's correct. The SB 954 was designed to close that loophole. So whether it's labor or whether it's a union-friendly shop or a non-union-friendly shop like ABC, it's still subject to the negotiation process, and that's what we look at when we determine machinist preemption? That's correct, so— But does it matter at all that then the end effect is that shops like ABC get shut out of the process? I don't think so, because, again, it's the— Has no relevance whatsoever, the impact of that? It's worker's wages that we're dealing with here, and the workers can choose to send their money to an industry advancement fund. Well, I think what you're saying is, because this is fair labor standards, that the cases— that it's a minimum wage type thing, that that has favored states being able to do that, and so there's a lot of Ninth Circuit precedent and there's Supreme Court precedent. That being said, I think what Judge Wynn's saying, so then people like ABC can get completely shut out, maybe we can't remedy that. The Supreme Court could certainly wipe out a lot of the precedent that they have or up to this point and say, hey, we don't like what states are doing because they're effectively, you know, they're using this as a ruse. But you're saying the precedent's all in your favor right now. Yes, and, in fact, the Supreme Court decided Fort Halifax and Metropolitan Life, which dealt with minimum labor standards regulation, and Fort Halifax actually dealt with the minimum labor standard regulation with an opt-out provision for CBAs, just like this statute has. Okay, I think we understand your argument, and we've allowed you extra time, so we'll go to the Attorney General's representative and give him ten minutes. I want to thank the Court for its time today. Thank you. Good morning, Your Honors. Seth Goldstein on behalf of California Attorney General Javier Becerra. The district court correctly dismissed Associated Builders' First Amendment claims for three independent reasons. First, SB 954, which prevents employers from reducing an employee's paycheck, regulates conduct, not speech. Second, even if the law did regulate speech, it is both viewpoint and content neutral. And third, nothing in SB 954 places an obstacle on Associated Builders' speech, and the government need not subsidize and make it easier for Associated Builders to speak. Well, you argue that it's conduct and not speech, but I look at Minneapolis Star and Tribune versus Minneapolis Commissioner of Revenue, and the Supreme Court struck down a law that taxed ink and paper because it indirectly affected newspapers, First Amendment rights. Isn't SB 954 similarly a conduct-based restriction that impermissibly impairs ABC speech? Your Honor, this is a situation where SB 954 might have an incidental impact on speech, but it is not. Well, you're saying it, like, puts them in a tank, not even incidental. Well, I think it's incidental in the sense of cases like this Court's recent decision in the pickup case in which this Court upheld the California law that bans sexual orientation change efforts to minors. And that law, which of course would affect what a psychiatrist or a psychologist could say to the minors, was found to be regulating conduct, not speech, because it was targeted at a harmful practice, which was the effect that this practice would have on minors. I think it's much more similar to that case or the case, the Arcara case, which we cited in our brief, in which there was a law that banned prostitution, and it had an incidental impact on affecting an adult bookstore and forcing it to close. But again, the Supreme Court in that case said that that law was regulating conduct and not speech. Also, even if this Court does find that the law regulates the speech, the law is both viewpoint and content neutral, and it does not discriminate the law based on what the industry advancement fund or employer can say or want to say. It's instead focused, as Mr. Allowed pointed out, about the workers agreeing to that reduction via a collective bargaining process. And again, I think there was a discussion about the legislative history that Judge Callahan pointed out. Some of the legislative history is included in the excerpts of record on pages 147 to 158, and it's clear that nothing in the legislative history is discussing targeting any speech or suppressing any speech. Instead, the entirety of the legislative history is about protection of worker wages through the collective bargaining process and not allowing the reduction to workers' wages unless they've agreed to that reduction. Well, most people are smart enough not to put something in like a way, and we're specifically doing this to get ABC, you know, that I wouldn't expect. While Congress or the legislature gets a lot of criticism, I think I give them credit that they would not say something like that. Yes, Your Honor. I think my broader point was just that there was nothing in the legislative history about speech at all, that the legislative history was entirely about protecting workers' wages. Also, and just more broadly, this is not simply the SB 954, and it does not simply affect speech for and against unionization. I think Associated Builders admitted in their complaint that they speak about issues related to job targeting programs, cooperation between government agencies and private contractors. They also speak about, you know, the construction industry as a whole. That they wouldn't be able to get the prevailing wage credit for that type of speech, you know, means that they might have less money to do that type of speech, but it's clear that this prevailing wage credit is not simply targeted just to speech for and against unionization. Well, let me ask you this then. Will you be able to answer the over-inclusive and the under-inclusive? Did he correctly pass that off to you? I'll try, Your Honor. Okay. So I'm going to try to just, because we're running out, I'm going to ask you both of the questions there to allow you to. So why isn't SB 954 over-inclusive by preventing individual employees to allow their employers to take a wage deductive for industry advancement fund contributions? And then also, why isn't SB 954 under-inclusive by not covering contributions to employee pension plans, health insurance plans, and the like? Okay. I will address them in the order presented, hopefully. The first point, I think the idea is that an individual worker lacks sufficient bargaining power to, that puts them at risk of having these prevailing wages taken from their contracts without their say-so. I didn't do a good job of describing that. But essentially, there are certain things we don't allow individual employees to opt out of, right? Like an employer is not allowed to ask an individual employee to opt out of the minimum wage, for example. And the concern is that there's too much of a power imbalance between the employer and the employee, such that they could coerce the employee to give up various protections. With collective bargaining, the employees are able to band together, and there's a thought that they have more bargaining power vis-à-vis their employer, and that's why we allow those employers. So employees in unions are more empowered than employees not in unions. Employees who have the benefit of collective bargaining agreements, that I think the Supreme Court cases have said, have more bargaining power. And so that's why in the minimum labor standards cases that Mr. Lau pointed out, we allow them to opt out of certain protections, like the prevailing wage, the advisory gold, the amount of hours they had to work in a given day, because there was a bargain for exchange. They might have given something up. They might be giving up some minimum labor standard, but they're also gaining something in return. That's the point of collective bargaining agreement. Turning to the under-inclusive argument and why certain things are included and other things are not, I think the idea is that pension payments, vacation, some of those things that are permissible reductions to the prevailing wage of employees, those types of things clearly and directly benefit the worker. So if the employee isn't getting, we use the example of $15 an hour. If the employee is not getting the $15 an hour in cash, but the employee is getting $14 an hour in cash and a dollar in pension, they're still getting a direct benefit. And with the industry advancement funds, there's clearly an argument that they directly benefit because they advocate for the interest of the industry as a whole, but it's not as clear. So we want, in that instance, the employees to have some say. If they think that the industry advancement fund benefits them, they could provide so via the collective bargaining process. Okay. Do either of my colleagues have any additional questions? Mr. Goldstein. Yes. I really don't understand Brown, but here's my understanding of the law that the legislatures of the 50 states can legislate, given their plenary police powers in this area, minimum labor standards we call it, so long as it doesn't, one, interfere with the process of collective bargaining and, two, doesn't create coercive speech restrictions for either employers or employees. Do I understand that's the purpose of 954 as contrasted with Brown? Because didn't the Supreme Court say in Brown that it had the effect of coercive speech on the part, prohibiting speech on the part of employers? Yes, Your Honor. I mean, this ties a little bit more to the argument that Mr. Lau was saying. But, yes, nothing in SB 954 prohibits an industry advancement fund like Associated Builders from speaking about any topic. Nothing prevents the employers or the employees from contributing any amount of money to an industry advancement fund like Associated Builders. So it doesn't have the speech restrictions that the Supreme Court struck down in Brown. Thank you, Your Honors. Thank you. Four points. The references. I gave him three minutes. Yes. Thank you. The references that have been made to collective bargaining agreements are out of context when we're talking about prevailing wage projects. One of the shortcomings of the district court's opinion, and one of the points that we believe that the appellees have failed to comment on adequately, is the context of the comments that they've made about collective bargaining agreements. It's easy to think of collective bargaining agreements as democratic results of cooperation between union and labor. But that doesn't exist in the industry that ABCCCC works within. The reason that ABCCCC is opposing project labor agreements is that they are entirely undemocratic. They are only authorized under Section 8F of the National Labor Relations Act to adopt project labor agreements in that single industry, and they avoid NLRB elections, they avoid the designation of a bargaining representative by employees, and they can be negotiated by the agencies that do the collective or the public works prior to any employees being hired. So where does this notion of employee consent come from? There is no employee consent to a pre-hire project labor agreement. They're dropped down on top by the powers that be. The man sets this up and imposes it on them. So this idea that this is a law based upon employee consent misrepresents the actual practical day-to-day problems that companies like Interpipe face. There's another issue here that is very important, and that is with regard to the concept that minimum labor standards cases are restricted, with all respect, Judge, in the way that you have mentioned, the Metropolitan Life v. Massachusetts case requires that a minimum labor standard to be lawful has to have equal application to unions and management. And that sentiment is repeated verbatim by Judge Pragerson in the American Hotel case that was cited by Mr. Lau and in the Fort Halifax case that was cited by Mr. Lau. I can read you these quotes. They're very direct. Mr. Wolds, my law clerk tells me the Supreme Court and the Ninth Circuit have routinely upheld opt-out provisions limited to CBAs. Well, that is true, but the opt-out provision doesn't even come into place if that violation of a core value of the National Labor Relations Act takes place. And there can be no greater violation of a core value under the National Labor Relations Act than a violation of free speech and an unlawful discriminatory allocation of power and finances between union and labor, and that's what we have here. I'm out of time. Okay, thank you. There were some questions from the panel about whether we have a right to receive employees' wages to fund our speech. And the fact of the matter is that the government has left in place the ability of some organizations to do that, even without consent, so long as it's negotiated by a union, because collective bargaining agreements do not ensure unanimous consent because they operate in the context of project labor agreements, which are negotiated prior to contractors even bidding. They have no relationship to consent, and we are put at a significant disadvantage. That does not silence us, but it disadvantages us, and that is a burden on our First Amendment rights. In response to the question of what can we not say now that we could before, in theory we could say anything, but in reality we can't because we have been completely deprived of funding, and that was the intent. We can develop new revenue sources. There's no prohibition against that, right? That's true, but I think this points to the purpose. And employers can still make the contribution if they think that ABCs, the ABCs of the world provide real value by putting out in the marketplace a non-pro-union viewpoint. They could still choose to fund it. They just can't take a prevailing wage credit for it. That's right, but in the context of public contracting, which is an incredibly competitive industry, you can see from the declarations of Interpipe's vice president that they just can't afford to. It doesn't make sense anymore. And the prevailing wage contribution is really a huge incentive to make these contributions, and it's the way that industry advancement funds survive as a whole. I think there was a question about whether, you know, there might be some pro-union industry advancement groups who don't get funding even under this regime, and perhaps in theory a fund like us who has our viewpoint could be party to a CBA. But I think the example of poll taxes is helpful and instructive. Proxies are there to be subtle, and there will often be a not total fit between the viewpoints or the people that they're trying to discriminate against and their actual effect. So in the case of poll taxes, it'll be true that some, it was true historically that some black voters were able to vote and some poor white voters were not able to, but everybody still knew what was going on there. It was intended to disadvantage a certain group, and that's why it was discriminatory. Is there anything in the legislative history, because it's not in the plain language of the statute, anything in the legislative history that suggests that the legislature considered the impact on groups like ABCs and intended to basically cut off their revenue stream? In the legislative history that was cited by the district court, it said that this wasn't just about consent, it was about concern over the money going without consent to activities that the government doesn't like. And the government, better than the legislative history, their briefs explicitly say that they were concerned about consent, not qua consent, but consent over money going to speech that they consider against workers' interests. That's their own statements, and that's very illustrative of the purpose here. Thank you. Thank you, everyone, for your arguments. This matter will stand submitted. I think it's a very interesting and difficult case, and we certainly appreciate, I think, that all counsel came very well prepared, and it's always a pleasure to hear well-argued cases. Thank you. This court will stand on recess until tomorrow at 9 a.m. All rise. This court shall stand on recess until tomorrow at 9 a.m. This court shall stand on recess until tomorrow at 9 a.m.
judges: Callahan, Nguyen, Pratt